## UNION OIL CO. OF CALIFORNIA *v.* THE SAN JACINTO ET AL.

No. 71–900.   Argued October 17, 1972—Decided December 5, 1972

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, MARSHALL, BLACKMUN, and POWELL, JJ., joined. STEWART, J., filed a dissenting opinion, in which DOUGLAS and BRENNAN, JJ., joined, *post,* p. 147.

*Kenneth E. Roberts* argued the cause and filed briefs for petitioner.

*Erskine B. Wood* argued the cause and filed briefs for respondents.

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

While proceeding up the Columbia River, the oil tanker S. S. *Santa Maria,* bareboat chartered by petitioner, was struck by a barge owned by respondent Oliver J. Olson & Co. The barge was being towed by the tugboat *San Jacinto,* owned by respondent Star & Crescent Towboat Co. Both vessels were damaged. Petitioner commenced this admiralty action for damages to the *Santa Maria,* and respondent cross-libeled for damages to the barge. The District Court found the collision resulted solely from

negligence on the part of the crew of the *San Jacinto,* and dismissed the cross-libel.  304 F. Supp. 519 (Ore. 1969). The Ninth Circuit affirmed the finding that the *San Jacinto* had been negligent, but determined that the *Santa Maria* was also negligent in violating the "half-distance" rule, 30 Stat. 99, 33 U. S. C. § 192.  That court therefore reversed with directions that the District Court determine the amount of damage sustained by the barge and assess damages under the divided-damages rule.  See *The Schooner Catherine* v. *Dickinson,* 17 How. 170 (1855).  We granted certiorari, 405 U. S. 954 (1972), principally to consider petitioner's request that we abandon the divided-damages rule.  The orderly disposition of the issues presented by the petition for certiorari, however, requires that we address ourselves to the issue of liability before reaching the question of damages.  Since in so doing we conclude that the Court of Appeals was wrong in holding the *Santa Maria* liable at all, we do not reach the issue of damages.

I

On the evening of December 24, 1967, the *Santa Maria,* loaded with 17,000 tons of petroleum products, was proceeding up the Columbia River toward Portland.  The ship was steaming on the Oregon side of the channel, with clear visibility.  At the same time, the *San Jacinto* was proceeding downriver, towing a 275-foot barge, fully loaded with lumber, by a 250-foot towline.  Proceeding on the Washington side of the channel, it had encountered foggy weather conditions upriver.  As the *San Jacinto* approached Cooper Point, the *Santa Maria,* steaming upstream, sighted the tug both visually and by radar. The two vessels were more than a mile apart and on opposite sides of the 500-foot-wide shipping channel. There was heavy fog, described as "tule fog," around Cooper Point, but the fog was localized on the Washing-

ton side of the channel. Although there was haze and drizzle, there was no fog on the Oregon side of the channel; the visibility from the bridge of the *Santa Maria* upstream was between one and one-half and two miles.

As the *San Jacinto* entered the fog on the Washington side off Cooper Point, the *Santa Maria* lost visual contact with the tug and barge. The *Santa Maria*'s pilot did not track the *San Jacinto* on radar, believing that the tug would remain on the Washington side of the channel and knowing that there was ample room for a port-to-port passage. At this time, the *Santa Maria* was proceeding at half-speed making approximately seven knots.

The watch on the *San Jacinto* had not sighted the *Santa Maria* when the tug entered the heavy fog off Cooper Point. The tug's captain testified that, after entering the fog, he cut speed to three or three and one-half knots, and the visibility dead ahead was approximately 50 yards. The *San Jacinto*'s navigators were "navigating by visual sight of the Washington coast," and the captain estimated that the tug passed between 50 and 75 yards off Cooper Point. At that point, the crew of the *San Jacinto* heard one blast of a ship's horn (later discovered to have been that of the *Santa Maria*), and responded with the fog signal for a tug with a barge in tow. No visual sighting of a ship was made, however. Shortly thereafter, the captain sighted range lights, which, he testified, he thought were 20 degrees off his *starboard* bow. To avoid what he anticipated to be a momentary collision, the captain swung the *San Jacinto* to port—towards the Oregon side of the channel—and executed a U-turn, hoping to run upriver and thus avoid a collision.

The *San Jacinto* started the U-turn while still in the heavy fog, and the execution of the turn brought the tug on a course directly across that of the *Santa Maria*. The *Santa Maria* sighted the *San Jacinto* emerging from the fog, at right angles to the *Santa Maria*, at a distance of

approximately 900 feet. Full astern was immediately ordered. The *San Jacinto,* quickly completing the turn, headed safely upriver. Before the *Santa Maria* could completely stop, however, the barge in tow sideslipped across the channel, crashing into the port bow of the *Santa Maria;* the force of that blow drove the tanker aground.

The District Court found that the *San Jacinto* and the barge, and those in charge of navigation, were negligent in eight respects, including navigating at excessive speed, failing to maintain a proper lookout, and "acting hastily and without sufficient cause in pulling the tow across the channel when there was adequate clearance for the tug and barge to pass port to port." The court found that "the collision was proximately caused by the sole fault and negligence" of the *San Jacinto* and the barge, and that the acts of negligence allegedly committed by the *Santa Maria* did not "proximately [contribute] to the collision and resulting damage." 304 F. Supp., at 521, 522.

The Ninth Circuit partially reversed, holding that the *Santa Maria* was proceeding at an immoderate speed in traveling at three to seven knots "while approaching the edge of the fog bank." That court reasoned that the *San Jacinto* was only 900 feet from the *Santa Maria* when the tug emerged from the fog bank, and the *Santa Maria*'s speed was such that she could not stop within half that distance. The court, relying on *The Silver Palm,* 94 F. 2d 754 (CA9), cert. denied *sub nom. United States* v. *Silver Line, Ltd.,* 304 U. S. 576 (1937), deemed it immaterial that the visibility up the Oregon side of the channel—the direction in which the *Santa Maria* was headed—was almost two miles, because in its view the "relevant distance" for calculating the proper speed under the half-distance rule was the distance between the tanker and the fog bank—to port of the *Santa Maria.* Finding

statutory fault, and ruling that petitioner had failed to prove that that fault could not have possibly contributed to the collision, see *The Pennsylvania,* 19 Wall. 125 (1874), the Court of Appeals held the *Santa Maria* liable for half the total damages.

## II

The question of the liability of the *Santa Maria* turns on the application of Art. 16 of the Inland Rules of Navigation, 33 U. S. C. § 192. That Rule provides in pertinent part:

> "Every vessel shall, in a fog, mist, falling snow, or heavy rainstorms, go at *a moderate speed,* having careful regard to the existing circumstances and conditions." (Emphasis added.)

Although the statutory test for determining the proper speed at which a vessel should proceed in a fog is phrased in general terms, our decisions have attached a well-recognized gloss to that phrase. This gloss on the statutory rule, variously referred to as the half-distance rule or the "rule of sight," is that, in a fog, "a moderate speed" is that

> "rate of speed as would enable [the vessel] to come to a standstill, by reversing her engines at full speed, before she should collide with a vessel which she should see through the fog." *The Nacoochee,* 137 U. S. 330, 339 (1890).

See also *The Colorado,* 91 U. S. 692, 702 (1876); *The Umbria,* 166 U. S. 404, 417 (1897). As stated in *The Chattahoochee,* 173 U. S. 540, 548 (1899), "[t]he principal reason for such reduction of speed is that it will give [both] vessels time to avoid a collision after coming in sight of each other." If two vessels, upon sighting each other, are proceeding at rates of speed such that

each can stop before it reaches the point at which the courses of the two intersect, collision is impossible.

There can be no quarrel with the salutary purpose of this "rule of thumb." It is premised on the notion that when a ship is traveling under foggy weather conditions in waters in which other ships might be proceeding on intersecting courses, the speed of each ship must be such as to enable her to stop within half the distance separating the ships when they first sight each other. Implicit in the rule, however, is the assumption that vessels can reasonably be expected to be traveling on intersecting courses. If, on the facts of the case, it is totally unrealistic to anticipate the possibility that a vessel will travel on a particular heading that would intersect the course of another ship, the reason for the rule is rather clearly not present.

Those cases in which this Court has upheld a finding of statutory fault because of a violation of the half-distance rule involved ships proceeding in fog on established coastal shipping lanes, *The City of New York,* 147 U. S. 72 (1893); *The Nacoochee, supra;* cf. *The Colorado, supra* (Lake Huron), or ships traveling near or in a harbor, *The Umbria, supra;* cf. *The Ludvig Holberg,* 157 U. S. 60 (1895) (no fault). We do not imply that because a vessel is running near fog, as opposed to running in it, the vessel is not required to proceed at "a moderate speed" in relation to the distance to the fog cover. That was, indeed, the circumstance in *The Silver Palm, supra,* upon which the Ninth Circuit relied. But there a naval cruiser was traveling, with clear visibility ahead but with fog banks on each side, on the busy coastal shipping lane between San Francisco and Los Angeles. On such a course it is reasonable to expect that another ship might steam out of the fog at right angles to, and on a collision course with, the first vessel.

The rule of sight was applicable there precisely because of the reasonable possibility that such an event might occur.

The facts of our case were significantly different. The *Santa Maria* and the *San Jacinto* were proceeding on opposite sides of a well-defined and relatively narrow channel. The *Santa Maria* had last sighted the tug only a mile ahead, proceeding along the Washington coast. Those in charge of the navigation of the tanker cannot be faulted for not anticipating the tug's totally unorthodox maneuver in darting across such a channel. *The Victory & The Plymothian,* 168 U. S. 410 (1897). The visibility in the direction in which the *Santa Maria* was headed was almost two miles. There is no evidence in the record suggesting that the speed of the tanker would have prevented her from coming to a complete halt within half the distance of sighting a vessel that was either proceeding on a remotely foreseeable intersecting course or else being overtaken by her. The tug emerged from a fog bank only 900 feet from the tanker on a course and for reasons that no seaman could, under the circumstances, have anticipated.

The District Court's finding that any negligence on the part of the *Santa Maria* did not "proximately [contribute] to the collision" was but another way of saying that fault based on the half-distance rule must have some relationship to the dangers against which that rule was designed to protect. Here it did not. We believe that the District Court, and not the Court of Appeals, reached the correct result on the issue of liability.

Since in our view respondents alone were at fault, there is no occasion to consider how damages should be apportioned were both vessels at fault.

*Reversed.*

Mr. Justice Stewart, with whom Mr. Justice Douglas and Mr. Justice Brennan join, dissenting.

On a misty Christmas Eve the petitioner's oil tanker—the *Santa Maria*—was moving upstream along the Oregon side of the channel of the Columbia River. The vessel was proceeding at half speed with forward visibility of one and a half to two miles. Both visually and by radar, the tanker's pilot sighted the respondent tug, the *San Jacinto,* which was moving downstream along the Washington side of the channel more than a mile ahead. The tug, with a heavily laden barge in tow, disappeared from sight into a patch of fog. The inexperienced crew of the tug became disoriented in the fog and mistakenly thought the tanker had veered to the Washington side of the channel. To avoid what he believed would be a collision, the master of the tug executed a sharp leftward U–turn directly into the path of the oncoming tanker. While the tug successfully completed its turn, the barge swung around and smashed into the tanker, damaging her forward left side and driving her aground.

In a complaint and cross-complaint the owners of both vessels sued, each charging the other with sole blame. The District Court found that the collision was entirely the fault of the tug—in navigating at an unreasonable speed in fog, in failing to maintain a proper lookout, in failing to sound fog signals, in failing to ascertain the risk of collision and sound the danger signal, in failing to reduce speed or take any evasive action, in failing to keep the tow in control, and in turning directly into the path of the tanker. 304 F. Supp. 519. Finding that the tanker was also at fault in proceeding at a rate in excess of that which would have allowed her to stop in one-half the visibility before her, the Court of Appeals for the Ninth Circuit modified the judgment of the District Court. 451 F. 2d 1369. Though the tug's fault was

"more flagrant and shocking," *id.*, at 1374, the tanker was held liable for half the damages, since she was unable to prove that her fault could not possibly have contributed to the collision.[1]

I would reaffirm the continued vitality of the "half-distance" rule and approve its application in this case. I cannot concur in the Court's decision, which, while apparently approving the "salutary purpose" of the rule, guts its certainty by making its application turn on elusive concepts such as the reasonable possibility of collision, or the particular bearing that a vessel might be expected to take on emerging from a fog bank. In short, the Court today allows a vessel to proceed at an immoderate speed, provided that its crew does not expect a collision. I cannot agree.

The half-distance rule is a rational interpretation of the command of Art. 16 of the Inland Rules that vessels shall proceed at a "moderate speed" in fog with a "careful regard to the existing circumstances and conditions." 33 U. S. C. § 192. The rule does not simply require a vessel to be able to stop in one-half the distance of her forward visibility, but rather "to maintain only such a rate of speed as would enable her to come to a standstill, by reversing her engines at full speed, before she should collide with a vessel which she should see through the fog." *The Nacoochee,* 137 U. S. 330, 339.[2] As one scholar phrased the rule: "the vessels must be able to stop, not within the distance of visibility, but

---

[1] See *The Pennsylvania,* 19 Wall. 125, 136; *O/Y Finlayson-Forssa A/B* v. *Pan Atlantic S. S. Corp.,* 259 F. 2d 11, 22.

[2] "The general consensus of opinion in this country is to the effect that a steamer is bound to use only such precautions as will enable her to stop in time to avoid a collision, after the approaching vessel comes in sight, provided such approaching vessel is herself going at the moderate speed required by law." *The Umbria,* 166 U. S. 404, 417.

before they collide." J. Griffin, The American Law of Collision 295 (1949).

In this case, the crew of the *Santa Maria* knew that the *San Jacinto* had disappeared into a fog bank over a mile ahead on the Washington side of the narrow channel. The tanker nevertheless steamed ahead at half-speed as it approached the edge of the fog bank. When the *Santa Maria* sighted the tug emerging from the fog and cutting directly across her course, no more than 900 feet separated the vessels. The Court of Appeals found a violation of the half-distance rule in that the tanker could not stop within 450 feet.[3] Indeed, since the tug had turned back upstream at the time of the tanker's collision with the barge, the *Santa Maria* covered considerably more than half the distance that initially separated the vessels.

I agree with the Court of Appeals that the half-distance rule correctly applies to the facts of this case. Not only was the *Santa Maria* navigating near a fog bank in a narrow, heavily traveled shipping channel, but she actually knew that a tug was in the fog bank off the port bow; the tug might become disoriented in the fog and emerge on a collision course. And for that reason the *Santa Maria* should not have been proceeding at a rate in excess of the speed which would have allowed her to stop in half the distance ahead. The tug emerged from the fog and cut directly across the path of the tanker, approximately 900 feet ahead. But surely the half-distance rule does not apply only to head-on collisions. See *The Silver Palm,* 94 F. 2d 754. Moreover, the tanker here should not be any less at fault because the tug emerged tangentially to her course rather than on a

---

[3] The District Court appears to have assumed as much:

"It is my view that any possible violation of Article 16 of the Inland Rules by the SS *Santa Maria,* or those in charge of her navigation, were technical in nature and were not a contributing cause of the collision." 304 F. Supp. 519, 522.

head-on collision course. If the tug had altered her course in the fog and emerged steaming head on into the tanker rather than across her course—which would have been quite possible since the channel was only 500 feet wide at this point—the *Santa Maria* would still have had to stop within 450 feet. Since the tug was not closing the distance between the vessels, the tanker actually had more distance within which to stop than she would have had if the tug had followed a more orthodox collision course. The half-distance rule cannot mean that a ship can travel in the direction of a fog bank, oblivious to the possibility that another vessel might become lost there and steam out across or into the first vessel's path.

Concepts such as "reasonable expectancy," "anticipated possibility," and "reasonable possibility," do little service to the half-distance rule. "[T]he genius of the Rules for Prevention of Collision is their certainty." *Hess Shipping Corp.* v. *S. S. Charles Lykes,* 417 F. 2d 346, 351 (Brown, J., dissenting). The half-distance rule is effective precisely because it is a measurable rule of thumb, a nautical speed limit. Speed limits would serve no useful purpose if they applied only when there was a foreseeable probability that an accident might occur.

Since I cannot say that the Court of Appeals for the Ninth Circuit incorrectly concluded that the *Santa Maria* had violated the half-distance rule, and that she was unable to prove that her fault could not have contributed to the collision, I would reach the question that we granted certiorari in this case to consider—the continued validity of the divided-damages rule. The Court, however, does not address that question, and I therefore refrain from expressing my views upon it.