ZIM ISRAEL NAVIGATION CO.,
LTD., Plaintiff,

v.

SPECIAL CARRIERS, INC., M/V
Acadia Forest, Defendants.

LASH CARRIERS, INC., Plaintiff,

v.

M/V EN GEDI, Her Engines, Tackle,
Apparel, etc., Zim Israel Navigation
Company, Ltd., Defendants.

ZIM ISRAEL NAVIGATION CO.,
LTD., Plaintiff,

v.

PETROLEOS MEXICANOS
S.A., Defendant.

HASSNEH INSURANCE CO., LTD.,
Hamagen Insurance Co., Ltd., Yardenia
Insurance Co., Ltd. and Biderman In-
surance Co., Ltd., Plaintiffs,

v.

MV EN GEDI, Zim Israel Navigation
Co., Ltd., MV Acadia Forest and
Lash Carriers, Inc., Defendants.

Civ. A. Nos. 82–418, 82–419,
82–3452 and 83–349.

United States District Court,
E.D. Louisiana.

June 5, 1985.

James L. Schupp, Jr., Hugh R. Straub, New Orleans, La., for Zim Israel Nav.

John J. Broders, George R. Alvey, Jr., New Orleans, La., for Lash Carriers.

Rene S. Paysse, New Orleans, La., for Hassneh Ins., et al.

J. Barbee Winston, Edward F. LeBreton, III, New Orleans, La., for Petroleos Mexicanos.

## MEMORANDUM OPINION

CASSIBRY, Senior District Judge:

These consolidated cases involve a collision in the Gulf of Mexico on January 25, 1982, between the M/V EN GEDI, owned by Zim Israel Navigation Co., Ltd. ("Zim Israel"), and the M/V ACADIA FOREST, owned by LASH Carriers, Inc. ("LASH"). Both vessels were damaged as a result of the collision, and the respective owners filed claims and counterclaims against one

another.[1] In addition, Zim Israel filed suit against Petroleos Mexicanos, S.A. ("PE-MEX"), the owner of the M/T JOSE COLO-MO. Although the JOSE COLOMO was not involved in the actual collision, it is alleged that the vessel contributed to the casualty by embarrassing the navigation of the EN GEDI, the ACADIA FOREST, or both.

After a trial on the issue of liability, the court held that the collision was caused solely by the ACADIA FOREST without fault on the part of the EN GEDI or the JOSE COLOMO. The court now enters the following findings of fact and conclusions of law in support of its judgment.

## FINDINGS OF FACT

1. The EN GEDI, an Israeli flag bulk carrier owned by Zim Israel, is approximately 196 meters in length, 27 meters in breadth, and 23,573 gross tons. On the evening of January 25, 1982, the EN GEDI was bound for Israel from Elmo, Louisiana with a load of yellow corn. After an uneventful passage to the head of passes on the Mississippi River, the EN GEDI had transited the Southwest Pass, and reached the Southwest Pass sea buoy where the bar pilot left the vessel. According to the EN GEDI's deck bell book, the vessel departed from the sea buoy at 2106 hours. The EN GEDI's master, Captain Leopold Spiegelman, ordered full ahead sea speed, and, after a slight deviation, set a course of 180 degrees into the Gulf of Mexico.

2. A safety fairway extends below the Southwest Pass sea buoy into the Gulf of Mexico. The fairway provides mariners with a secure route through the various offshore oil and gas structures located in the Gulf. From the sea buoy, the two-mile-wide fairway continues for approximately six miles and then bifurcates, forming an inverted "Y", with one branch extending southeast and the other southwest. The fairway does not constitute a designated

---

1. Although Special Carriers, Inc. is the named defendant in the suit brought by Zim Israel, LASH answered the complaint and defended the suit. LASH is the registered owner of the ACA- DIA FOREST, and there is no dispute about LASH's ultimate responsibility for any judgment rendered in this litigation.

traffic scheme and its use is entirely voluntary.

3. As the EN GEDI proceeded in the fairway, a vessel was sighted astern, on the EN GEDI's starboard quarter. This vessel proved to be the JOSE COLOMO, a Mexican flag liquid gas tanker, owned by PEMEX. The JOSE COLOMO is approximately 158 meters in length, 24 meters in breadth, and 15,819 gross tons.

On the night of the collision, the JOSE COLOMO was bound for Tampa, Florida with a partial cargo of liquefied ammonia. The JOSE COLOMO left the Southwest Pass sea buoy to her starboard side at approximately 2110 hours.[2] The master of the JOSE COLOMO, Captain Ramoa Jimenez Lopez, testified at deposition that he increased his vessel's speed from dead slow to full ahead maneuvering speed. Captain Jimenez estimated that at the time his vessel passed the sea buoy, the EN GEDI was less than one mile ahead and appeared to be on an identical course with the JOSE COLOMO of 180 degrees due south. The JOSE COLOMO subsequently overtook and passed the EN GEDI on the latter vessel's starboard side.

4. At about the time they saw the JOSE COLOMO, the navigators of the EN GEDI also noted the white masthead and range lights of the ACADIA FOREST bearing on the EN GEDI's port bow at approximately a forty degree angle. Captain Spiegelman estimated that at the time she was first sighted, the ACADIA FOREST was 3.5 nautical miles away from the EN GEDI. The ACADIA FOREST's navigation lights indicated that the vessel was proceeding northwest and was in a crossing relationship with both the EN GEDI and the JOSE COLOMO.

5. The ACADIA FOREST, a Liberian flag ship owned by LASH, is approximately 261 meters in length, 32 meters in breadth, and 33,231 gross tons. On the night of the collision, the ACADIA FOREST was bound for St. Rose, Louisiana from Balboa, Spain. At approximately 2000 hours, the master of the ACADIA FOREST, Captain Rolf C. Barth, contacted the Southwest Pass pilot station to report his vessel's estimated time of arrival at the Southwest Pass sea buoy.[3] The ACADIA FOREST proceeded towards the sea buoy through the southeast leg of the safety fairway on a course of 326 degrees. At 2100 hours, Captain Barth reduced speed from full ahead sea speed to full ahead harbor speed. As she proceeded, the ACADIA FOREST was positioned approximately in the middle of the safety fairway. Captain Barth testified that at 2113 hours, he observed the red side lights and white masthead and range lights of the EN GEDI and the JOSE COLOMO bearing on the ACADIA FOREST's starboard bow. The lights of the two vessels indicated they were in a crossing relationship with the ACADIA FOREST. Captain Barth ordered his vessel's speed decreased to half ahead, but made no alterations in the ACADIA FOREST's course of 326 degrees.

At approximately 2119 hours, an unsuccessful attempt was made to contact the two southbound ships by radio on VHF channel 16. A few seconds later, the Southwest Pass pilot station informed the ACADIA FOREST of the names of these vessels. Captain Barth then called the JOSE COLOMO by name to confirm her course and intentions. In the ensuing radio exchange, the navigators aboard the JOSE COLOMO confirmed that the tanker was continuing on a due south heading of 180 degrees. Captain Barth conceded at trial that he never called the EN GEDI by name, and the evidence indicates that no radio communication with the EN GEDI

---

2. The clock on board the JOSE COLOMO was set twenty minutes ahead of central standard time. Thus, the vessel's navigation log indicates passing the sea buoy at 2130 hours. All time references in this opinion are based on central standard time.

3. In describing the course of the ACADIA FOREST, I have used the times as reported in her deck log book. The clock on board the ACADIA FOREST was evidently two minutes faster than that aboard the EN GEDI; thus, the EN GEDI's log shows the collision to have occurred at 2123 hours, while the ACADIA FOREST's log shows 2125 hours.

was ever accomplished. The evidence further indicates that the EN GEDI's bridge radio monitored VHF channel 16 at all pertinent times.

6. Initially, the ACADIA FOREST did not unduly alarm those navigating the EN GEDI because the lights and position of the LASH vessel indicated a typical crossing situation in which the EN GEDI was the privileged vessel. Furthermore, as explained more fully below, the ACADIA FOREST was the burdened vessel and required to keep clear of the EN GEDI. Thus, Captain Spiegelman maintained his vessel's course and speed in the expectation that the ACADIA FOREST would alter her course to the right. However, as time passed and the distance between his vessel and the ACADIA FOREST decreased with no change in the relative bearing of either vessel, Captain Spiegelman became increasingly concerned.

Captain Spiegelman testified that approximately three minutes prior to the casualty, the ACADIA FOREST was 1.5 miles away from the EN GEDI on a direct collision course. Spiegelman sounded a one whistle blast to indicate his intention to turn right, and then altered the course of the EN GEDI five to ten degrees starboard. Captain Spiegelman contends that at this point in time, he was unable to alter the course of his vessel any further because the JOSE COLOMO was abreast of the EN GEDI and approximately 600 feet to starboard. Captain Jimenez of the JOSE COLOMO disagrees with this contention and asserts that the lateral distance separating the JOSE COLOMO and the EN GEDI during the overtaking was, at the closest point, about one half mile. Thus, the JOSE CO-LOMO interests argue that the JOSE CO-LOMO overtook and passed the EN GEDI at a distance which gave the EN GEDI ample maneuvering room. Furthermore, the JOSE COLOMO had drawn clear ahead of the EN GEDI before the risk of collision became imminent. This contention is supported by the ACADIA FOREST's log book which shows the JOSE COLOMO to have crossed the bow of the ACADIA FOREST a full two minutes prior to collision.

I conclude that the JOSE COLOMO properly overtook the EN GEDI and presented no embarrassment to the navigation of that vessel. The evidence, when viewed in its entirety, supports the JOSE COLOMO's version of the overtaking. Furthermore, even if the JOSE COLOMO was close aboard the EN GEDI three minutes prior to collision, I agree with the expert testimony of Master Mariner Robert C. Chamberlin that under these circumstances, the JOSE COLOMO's best course of action was to promptly clear the area and to maintain her course and speed. This she did.

7. After overtaking the EN GEDI, the JOSE COLOMO continued down the safety fairway on a heading of 180 degrees. The JOSE COLOMO passed the ACADIA FOREST port to port without incident. Although Captain Barth of the ACADIA FOREST testified that the presence of the JOSE COLOMO influenced his decisions, there was no evidence that the JOSE CO-LOMO committed any act or omission which embarrassed the navigation of the ACADIA FOREST. The ACADIA FOREST had been apprised of the JOSE COLO-MO's intentions by radio communication prior to the port-to-port passage between the two vessels.

8. Two minutes before the collision, Captain Barth reduced the speed of the ACADIA FOREST to dead slow ahead, but continued to hold his course of 326 degrees. Meanwhile, the EN GEDI sounded five short whistle blasts, the danger signal, and flashed a series of light signals with an Aldis lamp to the ACADIA FOREST. Still the ACADIA FOREST persisted in her course. One minute before the collision, Captain Spiegelman sounded a one-whistle blast and ordered the bulk carrier's helm hard right. The EN GEDI responded to the right rudder and turned quickly to starboard. However, at virtually the same moment, the ACADIA FOREST turned hard left, cancelling the EN GEDI's avoiding maneuver. Captain Barth ordered the ACADIA FOREST's engine full astern, but collision was imminent and inevitable. The

bow of the ACADIA FOREST struck the EN GEDI's port side just past her number four hatch at about a ninety degree angle.

## CONCLUSIONS OF LAW

1. This is an admiralty and maritime action within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. The court has jurisdiction pursuant to 28 U.S.C. section 1333, and venue is proper in the Eastern District of Louisiana.

2. The International Regulations for Preventing Collisions at Sea, 1972, are applicable to this case. 33 U.S.C.A. § 1602 (West 1978) (hereinafter referred to as "Rules").

■ 3. From the time the two vessels sighted one another until collision, a crossing situation existed between the ACADIA FOREST and the EN GEDI. Likewise, until the JOSE COLOMO passed ahead of the ACADIA FOREST, a crossing situation existed between the ACADIA FOREST and the JOSE COLOMO. Both southbound vessels were to the ACADIA FOREST's starboard side, and therefore, under Rule 15, the ACADIA FOREST was the burdened vessel and had a duty to keep out of the way of the EN GEDI and the JOSE COLOMO.[4] Further, under Rule 16, the ACADIA FOREST was obligated to "take early and substantial action to keep well clear." Under the facts of this case, it is evident that the ACADIA FOREST violated both these rules and breached her duty to the EN GEDI. The fact that the bow of the ACADIA FOREST rammed into the EN GEDI's port side, alone, bears stark witness to this conclusion.

**4.** Rule 15 provides as follows:
When two power-driven vessels are crossing so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way and shall, if the circumstances of the case admit, avoid crossing ahead of the other vessel.

**5.** Rule 8 provides, in relevant part, as follows:
Any action taken to avoid collision shall, if the circumstances of the case admit, be positive, made in ample time and with due regard to the observance of good seamanship.

■ 4. The ACADIA FOREST also violated Rule 8 by failing to take effective and early action to avoid the collision.[5] Captain Barth's testimony shows that he was aware, from the time he first sighted the EN GEDI, that the two ships were in a crossing situation so as to involve a risk of collision. Furthermore, under Rule 7, the collision continued to be evident to the ACADIA FOREST because there was a constant relative bearing with the approaching EN GEDI.[6]

■ The ACADIA FOREST had both the time and the sea room to avoid this collision by altering her course to starboard, permitting a safe port-to-port passage with the EN GEDI. A full six minutes prior to collision, nothing obstructed the ACADIA FOREST from making a radical turn to the right or even from making a full circle to the right. However, the ACADIA FOREST navigated as if she were the privileged vessel and maintained her course and speed from the time the EN GEDI was first sighted until just two minutes prior to collision. Even then she merely reduced engine speed to dead slow ahead rather than turning to starboard or stopping her engines entirely. Had she done so, even at this late stage, it is probable that the collision could have been avoided. In any event, Captain Barth's order to port one minute later was precisely the wrong move as it negated the effect of the EN GEDI's proper starboard turn, and caused the two vessels to collide. The ACADIA FOREST, through her captain's acts and omissions, violated every applicable rule of the road as well as the principles of good seamanship. In short, the ACADIA FOREST was negli-

If there is sufficient sea room, alteration of course alone may be the most effective action to avoid a close-quarters situation provided that it is made in good time, is substantial and does not result in another close-quarter situation.

**6.** Rule 7 provides that risk of collision "shall be deemed to exist if the compass bearing of an approaching vessel does not appreciably change."

gent and her negligence was a proximate and legal cause of this maritime casualty.

5. The ACADIA FOREST offers a number of arguments to explain her actions and to attempt to cast liability on the JOSE COLOMO and the EN GEDI. Captain Barth testified that he held his course and did not turn to the right because he assumed that the EN GEDI and the JOSE COLOMO would turn to port so as to effect a starboard-to-starboard passage between the two southbound vessels and the ACADIA FOREST. This assumption was based upon his experience in this area of the Gulf of Mexico and his opinion that the safety fairway constituted a narrow channel, and therefore, the various obligations imposed by the Rules were altered.

▮▮▮ First, there was no clear proof at trial that it is customary for vessels to pass starboard to starboard within the safety fairway. Therefore, I conclude that no such custom, having any legal significance, existed on the day of the collision. Furthermore, even if such a custom did exist, the Rules governed once the crossing relationship developed. Second, there is absolutely no foundation for the assertion that the safety fairway altered the effect of the Rules or created special circumstances justifying deviation from their strictures. The two-mile-wide fairway, which lies in the open waters of the Gulf of Mexico, is simply not a narrow channel. The fairway is part of a system established to provide shipping lanes free of oil structures. The fairway does not constitute a designated traffic scheme and its use is entirely voluntary. Vessels using the fairway do not acquire any special rights nor do their obligations under the Rules change.

In sum, there is nothing in the law or evidence to support Captain Barth's assumption that the EN GEDI and the JOSE COLOMO would turn to port and effect a starboard-to-starboard passage with the ACADIA FOREST. In fact, Rule 17 required the southbound vessels to maintain course and speed and expressly forbids a turn to port under the circumstances of this case.

▮▮▮ 6. Both the EN GEDI and the ACADIA FOREST attempt to cast liability on the JOSE COLOMO. As to the EN GEDI, the JOSE COLOMO was governed by Rule 13 when, proceeding in the same direction as the EN GEDI, she moved to overtake. As the overtaking vessel, the JOSE COLOMO was required to keep out of the way of the EN GEDI who was obliged to maintain her course and speed. *See* Rule 13 and Rule 17(a)(i). Under the facts and circumstances of this case, the JOSE COLOMO was not required to reach an agreement with the EN GEDI prior to overtaking her. Further, the JOSE COLOMO had no reason or obligation to anticipate the ultimate danger to the EN GEDI presented by the ACADIA FOREST. Like the EN GEDI, the JOSE COLOMO was entitled to assume that the ACADIA FOREST, as the burdened vessel, would conform to the Rules. *See The JAVA*, 81 U.S. (14 Wall.) 189, 199, 20 L.Ed. 834 (1871); *Union Oil Co. v. The SAN JACINTO*, 409 U.S. 140, 146, 93 S.Ct. 368, 372, 34 L.Ed.2d 365 (1972). Finally, if the EN GEDI assessed the ACADIA FOREST to pose a threat to her navigation and deemed it necessary to move starboard during the overtaking, she should have sounded the danger signal immediately. *See* Rule 34(d). The EN GEDI's own evidence establishes that the danger signal was not given until the overtaking was near completion and the JOSE COLOMO was sufficiently out of the way.

In sum, I conclude that the JOSE COLOMO complied with her obligations under the Rules and properly overtook the EN GEDI.

7. As between the JOSE COLOMO and the ACADIA FOREST, a crossing situation existed in which the former vessel was entitled to maintain her course and speed. *See* Rule 15 and Rule 17(a)(i). Again, the ACADIA FOREST was the burdened vessel and required to keep out of the JOSE COLOMO's way. The JOSE COLOMO fully discharged her duty to the ACADIA FOREST and obeyed the applicable Rules as well as the principles of good seaman-

ship. She gave more than adequate notice of her intention to continue on a heading of 180 degrees. Finally, contrary to the ACADIA FOREST's contention, the speed of the JOSE COLOMO was proper at all relevant times.

■ 8. The ACADIA FOREST argues that the collision was caused by the navigational faults of the EN GEDI. These faults are said to include failure to comply with local custom by navigating down the eastern border of the safety fairway, failure to comply with the narrow channel restrictions embodied in Rule 9, failure to comply with Rule 14 concerning head-on situations, failure to observe a safe speed in violation of Rule 6, failure to maintain a proper lookout in violation of Rule 5, failure to monitor the VHF radio in violation of the Vessel Bridge-To-Bridge Radiotelephone Act, and failure to take proper action to avoid the accident. Many of these contentions may be dealt with summarily, while others require slightly more analysis. However, none of them, either alone or together, have any merit.[7]

9. The ACADIA FOREST argues that the EN GEDI was negligent in that she navigated down the eastern border of the safety fairway contrary to the local custom, the principles of good seamanship, and general prudence. First, there was no evidence presented by the ACADIA FOREST which establishes such a custom. Second, there was some evidence which indicated that it was customary to travel down the eastern border of the fairway, as the EN GEDI did, because of the presence of a dump site on the western border. Thus, this ground for negligence on the part of the EN GEDI is without foundation.

10. As discussed previously, the safety fairway does not constitute a narrow channel. Even the ACADIA FOREST's expert witness at trial, Captain Kenneth C. Torrens, did not dispute this conclusion. Thus, the special rules for navigating a narrow channel do not apply in this case.

11. There is no doubt that the ACADIA FOREST and the EN GEDI were in a crossing relationship from the time they sighted one another until collision. The ACADIA FOREST's contrary assertion that this was a meeting situation is rejected.

■ 12. The suggestion that the EN GEDI navigated at an unsafe speed is likewise rejected. All witnesses described the night of the collision as clear with visibility excellent and seas calm. Furthermore, the only vessels in the vicinity at any pertinent time were the three involved in this litigation. After considering all relevant factors, I conclude that the speed of the EN GEDI was safe and proper.

13. On the night of the collision, the EN GEDI was properly manned by competent personnel. Her navigators maintained a proper lookout at all times and correctly appraised the relationship of their vessel with respect to the ACADIA FOREST, both visually and by radar. I have already found that the EN GEDI's bridge radio monitored VHF channel 16 at all pertinent times. Although the EN GEDI did not attempt to communicate with the ACADIA FOREST by radio, I find that such communication was unnecessary under the facts and circumstances of this case, and therefore, the EN GEDI did not breach her statutory duty under the Vessel Bridge-To-Bridge Radiotelephone Act. *See* 33 U.S.C.A. §§ 1201–1208 (West 1978); 33 C.F.R. § 26.04(b) (1984), *quoted in Empresa Lineas Maritimas Argentinas, S.A. v. United States*, 1979 A.M.C. 2607, 2615.

The EN GEDI communicated her intentions and concerns by Aldis lamp and whistle signals. In addition, the EN GEDI displayed all the proper navigational lights, and, in fact, the navigators aboard the ACADIA FOREST testified that they saw the red and white navigation lights of the EN GEDI. Thus, on this clear night, visual contact was more than adequate as a form

---

7. In most, if not all, instances, the ACADIA FOREST levels the same charges of negligence against the JOSE COLOMO. My resolution of these contentions applies equally to the JOSE COLOMO.

of communication. Radio contact would not have provided the ACADIA FOREST with any information she did not already possess. Furthermore, there is some question as to whether radio communication would have altered the ACADIA FOREST's course in any case. Even when the ACADIA FOREST was informed by the JOSE COLOMO of her intent to proceed due south, the ACADIA FOREST held her position without giving way.

■ 14. The EN GEDI acted properly under the Rules as the privileged vessel in a crossing situation by maintaining her course and speed. She was entitled to assume that the ACADIA FOREST would likewise obey the Rules and keep clear. When it became evident that the ACADIA FOREST was not going to keep clear, the EN GEDI sounded the proper whistle signals and turned to starboard in an attempt to avoid the collision. Even the ACADIA FOREST's expert witness agreed that a left turn was neither appropriate nor valid for the EN GEDI in view of Rule 17(c).[8] In sum, the EN GEDI acted in full compliance with the Rules and according to the principles of good seamanship.

■ 15. Finally, the ACADIA FOREST argues that she was placed in extremis by the EN GEDI and the JOSE COLOMO, and that, therefore, any navigational faults on her part should be excused. There is no doubt that the situation presented on the night of January 25, 1982 was one of extreme circumstances. However, the situation was created, and the collision caused, solely by the fault of the ACADIA FOREST and her navigators.

### SUMMARY

The collision between the ACADIA FOREST and the EN GEDI was caused solely by the ACADIA FOREST without fault on the part of the EN GEDI or the JOSE COLOMO. The cargo claim in this consolidated litigation has been settled. The per-

sonal injury claim was severed at trial and the consolidation revoked as to that case. Subsequently, the personal injury claim was also settled. The only remaining issue is the amount of damage sustained by the EN GEDI as a result of the collision. This issue will be referred to Magistrate Fonseca for disposition. The Clerk of the Court shall withhold entry of final judgment until the damages have been ascertained.

8. Rule 17(c) provides as follows:
   A power-driven vessel which takes action in a crossing situation in accordance with subparagraph (a)(ii) of this Rule to avoid collision

with another power-driven vessel shall, if the circumstances of the case admit, not alter course to port for a vessel on her own port side.